UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UCHENNA CYNTHIA NDUKWE, | ) ) ) ) | Civil Action No. |
| Plaintiff, | ) ) |  |
| v. | ) ) | COMPLAINT |
| CHIKODIRI NDUKWE, | ) ) ) |  |
| Defendant, | ) ) ) |  |

### PARTIES

1. The Plaintiff, Uchenna Cynthia Ndukwe, is a citizen of the State of Nigeria who resides at 126 Port Avenue, 2nd Floor, Elizabeth, New Jersey 07206.

2. The Defendant, Chikodiri Ndukwe, is a naturalized citizen of the United States who resides at 10 Harbor Front Court, Elizabeth, New Jersey 07206, and is therefore also a citizen of the State of New Jersey.

3. Plaintiff and Defendant are sisters, each being born to Mr. & Mrs. John and Regina Ndukwe in Nigeria in a family whose children totaled twelve (12) brothers and sisters.

4. The Defendant was born in 1975.

5. The Plaintiff was born in 1980.

6. The parties' father, John Ndukwe, is now deceased. The parties' mother, Regina Ndukwe, is still alive.

1

## JURISDICTION & VENUE

7. This is a Complaint for trafficking, involuntary servitude, and financial exploitation of Plaintiff by Defendant in violation of 18 U.S.C. §§ 1589 and 1590, for which a private right of action exists under 18 U.S.C. § 1595 ("the Federal claims"). Federal question jurisdiction over these claims exists under 28 U.S.C. § 1331.

8. The Complaint also sets forth certain claims by Plaintiff against Defendant arising under New Jersey law ("the New Jersey claims"). The Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) over the New Jersey claims as the parties are citizens of different states (New Jersey, USA and Nigeria) and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9. Alternatively, the Court has pendent jurisdiction over the New Jersey claims, since they arise out of a common nucleus of operative fact with the Federal claims for trafficking, involuntary servitude, and financial exploitation of Plaintiff by Defendant.

10. Venue is proper for both the Federal and New Jersey claims under 28 U.S.C. § 1391(b)(1) since the Defendant resides in the State of New Jersey.

## COUNT I: TRAFFICKING, INVOLUNTARY SERVITUDE AND FINANCIAL EXPLOITATION IN VIOLATION OF FEDERAL CRIMINAL LAW

11. Prior to October 30, 1999 Plaintiff was a 19-year-old teenager living with her parents in her home town of Umuahia, Nigeria. At that time she had never traveled outside of Nigeria and, in contrast to many of her fellow Nigerian citizens, had no desire to do so.

12. Plaintiff was, prior to October 30, 1999, romantically involved with one Patrick Ukaigwe, with whom she whom she had formed a close relationship while attending Enugu State University of Science and Technology in Nigeria, and whom she had planned to marry

2

following their graduation from the university.

13. Plaintiff's marital plans with Patrick Ukaigwe were strongly opposed by Plaintiff's father, who flatly prohibited the marriage.

14. Plaintiff's family is part of the Ibo tribe in Nigeria, and the nature of Ibo tribal society at the time was and remains such that a father's word in such matters "is law." Absent her father's approval of the marriage, Plaintiff's planned union with Patrick Ukaigwe was an economic, social and practical impossibility.

15. When Plaintiff nonetheless refused to abandon her plans to marry Patrick Ukaigwe, her father saw it as a grave affront to his paternal authority, and he took steps to "solve the problem" once and for all.

16. Specifically, Plaintiff's father conspired with the Defendant to force Plaintiff to travel to the United States with travel documents provided by the Defendant.

17. At the time this occurred, Defendant was still a lawful permanent resident ("LPR") of the United States. The "travel documents" that the Defendant sent to Plaintiff's father for Plaintiff's use were the Defendant's own Nigerian passport and U.S. permanent resident card (also known as an "I-551" or "green card").

18. The passport in question was in fact, one of many Nigerian passports that Defendant unlawfully maintained under a variety of similarly worded Nigerian names.

19. Plaintiff resisted coming to the United States by fleeing her parents' house and living for a time with her sister, one Alice Ndukwe. However, Plaintiff was obliged to return to her parents' house when her father pressured the said Alice Ndukwe not to allow Plaintiff to remain in her house any longer.

20. Upon return to her parents' house Plaintiff's father presented Plaintiff with an ultimatum:

3

Plaintiff could use the "travel documents" to go to the United States, or be completely disowned by Plaintiff's parents.

21. The prospect of being disowned terrified Plaintiff, as it would have left her completely isolated in her own country, with no place to live and no independent means of support. Thus, Plaintiff considered that she had no choice but to use Defendant's travel documents to go to the United States.

22. Despite the foregoing, Plaintiff, after much pleading and begging with her father, secured what she believed was his agreement that if Plaintiff spent two to three months in the United States with Defendant and did not like it, Plaintiff could return to Nigeria.

23. Using the Defendant's Nigerian passport and green card, Plaintiff flew to the United States and was inspected and admitted to the United States under the Defendant's name at Newark International Airport, Newark, New Jersey, on October 31, 1999.

24. The plans and actions of the Defendant and Plaintiff's father, set forth above, to secure Plaintiff's inspection and admission to the United States through the use of the Defendant's passport and I-551, were in violation of numerous criminal provisions of the Immigration and Nationality Act ("INA"), INA Section 101 *et seq.*, 8 U.S.C. § 1101 *et seq.*, including but not limited to INA Section 274, 8 U.S.C. § 1324, entitled "Bringing in and Harboring Certain Aliens."

25. The circumstance of Plaintiff's inspection and admission to the United States on October 31, 2009 also made her a prime target for trafficking, involuntary servitude, and financial exploitation by Defendant, who wasted little time in victimizing Plaintiff because of it.

26. Defendant picked Plaintiff up upon her arrival at Newark International Airport, and took her to Defendant's home at 150 Belmont Ave., Jersey City, New Jersey.  There Plaintiff

remained housebound, afraid to go out because she had no identity papers, for almost three months.

27. In January 2000 Defendant took Plaintiff to Defendant's new residence at 26 Bond Street, in Elizabeth, New Jersey and informed Plaintiff that it was "time for you to get a job." Defendant instructed Plaintiff to "look for a job" using the Defendant's name and identity at the "Jersey Gardens" Shopping Complex near Newark International Airport, which was within walking distance of 26 Bond Street.

28. The first job offer Plaintiff received was at "Kids Town," located at the aforesaid Jersey Gardens Mall Shopping Complex Elizabeth, NJ.

29. After Kids Town expressed interest in hiring Plaintiff, Defendant gave Plaintiff her Social Security card and I-551 for the employment interview, and required Plaintiff to memorize her Social Security Number, so that there would be "no question" that it was "Plaintiff's" number.

30. As a result of the interview Plaintiff obtained the advertised job at Kids Town at a rate of $5.75/hr.

31. Defendant immediately calculated that Plaintiff would be earning between $157-$175/wk, and informed Plaintiff that she would have to start paying "her share" of the residential utilities.

32. Defendant then took control of Plaintiff's paycheck, and gave Plaintiff $40/week out of said earnings. "Welcome to America" was how Defendant described this arrangement to Plaintiff.

33. When Plaintiff protested that she did not want to stay in America, and needed the money from her earnings for travel expenses back to Nigeria, as her father promised she could,

Defendant laughed at Plaintiff and told Plaintiff she had no intention of letting Plaintiff use her travel documents to return to Nigeria.

34. The only option Plaintiff had, Defendant explained, was to stay in America and work for Defendant.

35. That Plaintiff had no ability to return to Nigeria, and to escape from the situation in which she found herself, was also made clear to her when her father visited the United States in February 2000 to confirm with his own eyes that she was physically in New Jersey and under the Defendant's control.

36. Defendant moved from 26 Bond Street in Elizabeth, New Jersey in October 2000 to 126 Port Avenue, 2nd Floor in Elizabeth, where she continued to exploit Plaintiff by requiring that Plaintiff move with Defendant and continue to pay "rent" to Defendant.

37. For the next nine years Defendant ruthlessly exploited Plaintiff, reducing Plaintiff to a wretched condition of constant anxiety, fear and involuntary servitude by requiring and coercing Plaintiff to pose as the Defendant for various employers, and by coercing Plaintiff with constant threats of exposure of Plaintiff's unlawful presence status—and through other methods of illegal coercion detailed herein—to turn over to Defendant as much of Plaintiff's earnings and savings as Defendant could extract and steal from Plaintiff.

38. During the nine years in question, Defendant constantly pressured Plaintiff to get new employment at higher rates of pay because "you can do better than this." If Plaintiff objected at any time to what Defendant was demanding of her, Defendant's invariable response was to threaten Plaintiff with exposure of Plaintiff's unlawful presence in the United States.

39. During the nine years in question, Defendant always gave Plaintiff Defendant's original identity papers and social security documents for Plaintiff's employment interviews and hiring, and after hiring Defendant always took her documents back.

40. During the nine years in question, the employers for whom Plaintiff worked under the aforesaid conditions of involuntary servitude included, to the best of Plaintiff's recollection, the following:

    a. Kids Town, Elizabeth, New Jersey, 2000  (3 months)

    b. Mikasa Houseware, Secaucus, New Jersey, 2000 – 2002 (30 months)

    c. Millennium Agency, New York City, New York, 2002 (12 months)

    d. Target Department Store, Union, New Jersey, 2003-2007 (48 months)

    e. Shoppers World, Elizabeth, New Jersey, 2007 (4 months)

    f. Home Decorator, Maplewood, New Jersey, 2007 (3 months)

    g. Annie Sez, Millburn, New Jersey, 2008-2009 (10 months)

41. Defendant also required Plaintiff to report herself as a single taxpayer with zero deductions and to turn over all W-2s to Defendant for the filing of annual federal and state income tax returns.  When the refund checks came in each year, Defendant kept all refund checks for herself.

42. In addition to misuse of Plaintiff's true identity for the purpose of filing fraudulent federal income tax returns, Defendant devised other means to extort and extract Plaintiff's earnings from her, and to steal what little savings Plaintiff managed to accumulate on her own behalf.

43. In 2001 Defendant required Plaintiff to open a personal checking account with Provident Bank, using Defendant's I-551 and Social Security number, and to arrange for automatic

paycheck deposits into said account.

44. This gave Defendant access to checking account balance information throughout the year and enabled Defendant to periodically draw down the account and convert Plaintiff's earnings for Defendant's own use.

45. Defendant's exploitive acts against Plaintiff created enormous tensions between the two, and prompted Plaintiff to try and break free of the Defendant's control, with the help of other family members in the United States, but with varying degrees of success.

46. In February 2001 Plaintiff applied for and obtained Plaintiff a Nigerian passport in her own name that for the first time gave her a true identity in the United States.

47. In April 2001, following an argument with Defendant about Defendant's continuing exploitation of her, Plaintiff was able was able to move from Defendant's residence and take up temporary residence with Plaintiff's aunt, one Oyidiya Okoroafor, at 152 Belmont Ave., Elizabeth, New Jersey.

48. Plaintiff remained living at this address until December 2001, when she established her first independent residence in the United States at 26 Winans St, East Orange, New Jersey.

49. Notwithstanding the foregoing, in July 2001 Defendant committed an act of identity theft against Plaintiff by applying, without Plaintiff's knowledge or consent, for an Internal Revenue Service "Individual Tax Identification Number" ("ITIN") in Plaintiff's name that also falsely listed Plaintiff's address as Defendant's address at 126 Port Avenue in Elizabeth, New Jersey.

50. Defendant thereafter falsely listed Plaintiff as a "dependant" on Defendant's federal income tax returns, and continues to do so.

51. When Plaintiff learned that an ITIN had been established in her name, and was being misused by Defendant to falsely claim Plaintiff as a "dependent" on her tax returns, she confronted Defendant about it. Plaintiff was again threatened by Defendant that if Plaintiff persisted in her complaints, Defendant would report Plaintiff's "illegal" use of Defendant's identity, and unlawful presence in the United States.

52. The aforesaid acts of Defendant in applying for and misappropriating Plaintiff's name on an ITIN and using it to file false tax returns, have created enormous problems for Plaintiff in attempting to file and report her own income tax returns to the Internal Revenue Service.

53. By virtue of the foregoing threats made by Defendant against Plaintiff after Plaintiff complained about this illegal practice, the aforesaid acts also constitute another form of trafficking, exploitation and abuse of Plaintiff by Defendant.

54. By April 2004, Defendant was in the process of moving to a new residence she purchased at 118 Port Ave, Elizabeth, New Jersey, while retaining ownership of her prior apartment at 126 Port Avenue, 2nd Floor, Elizabeth, New Jersey.

55. Defendant told Plaintiff that she could no longer live at Plaintiff's residence at 26 Winans St., East Orange, New Jersey, and would have to reoccupy Defendant's apartment at 126 Port Avenue, 2nd Floor, Elizabeth, New Jersey, since no one else was willing to rent it at the price Defendant wanted.

56. The apartment was far larger than Plaintiff's needs, and the "rent" Plaintiff was required to pay was excessive, more than the rental fair market value of the apartment, and far more than Plaintiff could afford; in addition, Defendant also required Plaintiff to pay one-and-one-half months "rent" as a "security deposit," which amount Defendant has retained

without any written obligation to repay.

57. When Plaintiff complained to Defendant about being required to live in the apartment, and being required to pay the aforesaid "rent" and "security deposit," Plaintiff was once again threatened by Defendant that if Plaintiff persisted in her complaints, Defendant would report Plaintiff's "illegal" use of Defendant's identity, and unlawful presence in the United States.

58. In February 2005, Plaintiff met Falcao Beneche, a Haitian-American whom Plaintiff married on November 30, 2006.

59. After Plaintiff's marriage she and her husband resided at Defendant's apartment at 126 Port Avenue, 2nd Floor, Elizabeth, New Jersey but neither was able to tolerate Defendant's continued financial exploitation of Plaintiff, in the form of "rent;" false federal income tax reporting by Defendant of Plaintiff's income as her own; false reporting of Plaintiff as a "dependent" of Defendant for federal income tax purposes; and ongoing misappropriation of Plaintiff's earnings as Defendant's own.

60. During the course of Plaintiff's occupancy of the aforesaid apartment Defendant invaded Plaintiff and her husband's privacy on numerous occasions by using a duplicate original key to the apartment to enter the premises when neither Plaintiff nor her husband were present.

61. These "visits" were made without Plaintiff's permission; served no legitimate "landlord" purpose. To the contrary, Plaintiff's personal possessions, such as clothes and other items, were invariably disturbed as a result of these "visits," as if Defendant was looking for personal property or money of Plaintiff's that Defendant could steal.

62. Plaintiff and her husband were greatly disturbed by these invasions of privacy, and

changed the lock to the apartment at their own expense; Plaintiff also refused to accede to Defendant's demand that she deliver a spare key for the new lock to the Defendant.

63. Things reached a breaking point in January 2009 when Plaintiff, encouraged by her husband, informed Defendant that Plaintiff would no longer claim "0" deductions on her annual W-2 election with her employer; would no longer tolerate being fraudulently claimed as a "dependent" of Defendant's income tax returns; would not, in response to Defendant's continuing demands, surrender a spare key to the apartment; and that Plaintiff and her husband were in fact planning on moving from the apartment as soon as they could.

64. Defendant was enraged by the independence that Plaintiff showed in standing up for herself, and once again threatened to retaliate against Plaintiff by reporting her to the authorities.

65. Defendant carried out her threat against Plaintiff by maliciously and intentionally causing false criminal charges to be filed against Plaintiff in the Superior Court of New Jersey, Law Division, Essex County for, *inter alia*, alleged identity theft in violation of N.J.S.A. 2C:21-17(a)(1), *Impersonation; Theft of Identity; crime*, which provides:

```
A person is guilty of an offense if the person:(1)
impersonates another or assumes a false identity and
does an act in such assumed character or false identity
for the purpose of obtaining a benefit for himself or
another or to injure or defraud another;
```

66. After a thorough review of the facts underlying the aforementioned criminal charges by the Essex County Prosecutor and the Pre-Trial Intervention Director, Plaintiff was admitted to the State of New Jersey pre-trial intervention (PTI) program established under N.J.S.A. 2C:43-12 & 13, without a plea of guilty to any of the charges made against her. A true and correct copy of the PTI Order of Postponement is attached to this

11

Complaint as "Exhibit A."

67. The aforementioned PTI Order was entered with Special Conditions of PTI Supervision, which requires that Plaintiff "Seek/maintain employment" and "Take steps to legalize immigration status."  A true and correct copy of the Special Conditions of PTI Supervision setting forth above is attached to this Complaint as "Exhibit B."

68. Plaintiff's complaint in this matter is part of Plaintiff's effort to comply with the aforementioned Special Conditions of PTI Supervision.

69. The acts of the Defendant against Plaintiff set forth above constitute trafficking, involuntary servitude, and financial exploitation of Plaintiff by Defendant in violation of 18 U.S.C. §§ 1589 and 1590, for which Plaintiff hereby seeks civil remedies against Defendant under 18 U.S.C. § 1595, including an award of damages and appropriate equitable relief.

70. The aforesaid acts of Defendant have not only damaged Plaintiff economically, but also physically.  The enormous stress and anxiety Plaintiff has been forced to live under as a victim of trafficking has also caused her to develop chronic high blood pressure.

WHEREFORE, Plaintiff demands the following relief against Defendant:

A. That the Court order Defendant turn over to Plaintiff the original and any copies of Defendant's Nigerian Passport and I-551 used to procure Plaintiff's inspection and admission to the United States on October 31, 1999, so that Plaintiff can make proper application to the U.S. Department of Homeland Security for permanent resident status based on her prior inspection and admission to the United States, and bona fide marriage to her US Citizen husband;

B. That the Court Order Defendant to file a Freedom Of Information Act ("FOIA")

    Request with the Department of Homeland Security at the National Records Center, Lee's Summit, Missouri, to obtain a copy of Defendant's complete Alien file (also known as an "A File), and that the Court Order same to be turned over to Plaintiff so that it may be used by Plaintiff make proper application to the U.S. Department of Homeland Security for permanent resident status based on her prior inspection and admission to the United States, and bona fide marriage to her US Citizen husband;

C. That the Court Order Defendant to strictly account to Plaintiff for all of Plaintiff's earnings, monies and other payments turned over to Defendant as a result of the trafficking, involuntary servitude, and financial exploitation of Plaintiff by Defendant, and award restitution to Plaintiff for the monies wrongfully taken from her, including allowance for proper income tax liability, interest and costs; and

D. That the Court award Plaintiff compensatory economic, personal injury and punitive damages for Defendant's outrageous conduct in making her Plaintiff-sister a victim of illegal trafficking, involuntary servitude, and financial exploitation, together with interest, costs and attorneys' fees.

## COUNT II: MALICIOUS PROSECUTION UNDER NEW JERSEY LAW

71. Plaintiff hereby re-alleges paragraphs 1-70 of Count I of the Complaint as if fully set forth at length as part of Count II of the Complaint.

72. The actions of Defendant (a) in causing the aforesaid criminal charges alleging "identity theft" to be made against Plaintiff in New Jersey Superior Court; (b) were actuated by malice on the part of the Defendant against Plaintiff, (c) were made without probable cause in the circumstances of this case; and (d) were resolved in Plaintiff's favor by the aforesaid PTI disposition without a plea of guilty on the part of Plaintiff.

73. The aforesaid actions of Defendant caused great damage to Plaintiff economically, physically and emotionally, and damaged Plaintiff's reputation as well.

74. Defendant is liable to Plaintiff under New Jersey law for the aforesaid damages for the tort of malicious prosecution.

WHEREFORE, Plaintiff demands that the Court enter judgment against Defendant for compensatory and punitive damages, together with interest, cost and attorneys' fees.

## COUNT III: CONVERSION UNDER NEW JERSEY LAW

75. Plaintiff hereby re-alleges paragraphs 1-74 of Counts I and II of the Complaint as if fully set forth at length as part of Count III of the Complaint.

76. Defendant's intentional and fraudulent misappropriation and exercise of control of Plaintiff's earnings and monies over the aforesaid nine year period constitutes conversion of said earnings and monies under New Jersey law, for which Defendant is liable to Plaintiff for damages.

WHEREFORE, Plaintiff demands that the Court enter judgment against Defendant for compensatory and punitive damages, together with interest, cost and attorneys' fees.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER NEW JERSEY LAW

77. Plaintiff hereby re-alleges paragraphs 1-76 of Counts I, II and III of the Complaint as if fully set forth at length as part of Count IV of the Complaint.

78. The actions of the Defendant as set forth above were intended to inflict emotional distress on the Plaintiff and/or were of such a character that Defendant knew or should have known that severe emotional distress to Plaintiff was their likely result.

79. The actions of the Defendant as set forth above were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and are fairly regarded as atrocious and utterly intolerable in a civilized community.

80. The actions of the Defendant as set forth above were the cause of severe emotional distress experienced by the Plaintiff.

81. Defendant is liable to Plaintiff under New Jersey law for the tort of intentional infliction of severe emotional distress.

WHEREFORE, Plaintiff demands that the Court enter judgment against Defendant for compensatory and punitive damages, together with interest, cost and attorneys' fees.

Date:  December 22, 2009

                                                                             Brian D. O'Neill
                                                                             **BRIAN D. O'NEILL**
                                                                             **ATTORNEY AT LAW, LLC**
                                                                             oneillaw@verizon.net
                                                                             6 Dumont Place, 1st Floor
                                                                             PO BOX 639
                                                                             Morristown, NJ 07963
                                                                             201-803-2126 (Tel.)
                                                                             973-267-4004 (Fax)
                                                                             *Attorney for Plaintiff*



# PRETRIAL INTERVENTION

## ORDER OF POSTPONEMENT

| STATE OF NEW JERSEY | ☑ 1st ORDER |
|---|---|
| VS. | ☐ 2nd ORDER |
| CYNTHIA  U  NDUKWE | ☐ 3rd ORDER |

| ADDRESS | | ZIP |
|---|---|---|
| 126 PORT AVENUE, SECOND FLOOR   ELIZABETH | NJ | 07206 |

| COUNTY | PROMIS NUMBER(S) | CAPS ID NUMBER |
|---|---|---|
| ESSEX | 09 005072-001 | |

**IND / ACC / COMPLAINT NUMBER(S), CHARGES AND STATUTES**

S-2009-000290-0712 / S-2009-000289-0712 / S-2009-000288-0712 / S-2009-000291-0712 / S-2009-000292-0712

1. ASSUMES FALSE IDENTITY, 2C:21-17A(1);

2. RECEIVING STOLEN PROPERTY-KNOW, 2C:20-7A;

3. RECEIVING STOLEN PROPERTY-KNOW, 2C:20-7A;

**RELATED DISORDERLY PERSONS AND MOTOR VEHICLE CHARGES**

S-2009-000291-0712
DP01. FALSE INFO TO OFFICIALS, 2C:28-3B(1);
S-2009-000292-0712
DP02. HINDER OWN PROS-FALSE INFO LEO, 2C:29-3B(4);

In accordance with the provisions of N.J.S.A. 2C:43-12 & 13 & R. 3:28, and upon the recommendation of the PTI Director and with the consent of the Prosecutor and defendant to the attached listed terms and conditions of the supervisory treatment, it is ORDERED that all further proceedings be and are postponed for a period of _12_ months, beginning _10/30/09_.

| DATE | JUDGE |
|---|---|
| 10/30/09 | Peter J. Vazquez |
| DATE | PROSECUTOR |
| 10/7/09 | Hilary Brunell CAP |
| DATE | PTI DIRECTOR |
| | |

I consent to the conditions set forth in the standard and special conditions. I agree to a postponement of further proceedings for a period not to exceed three years. During this period I waive my right to a speedy trial on this or any related charges, including disorderly persons offenses and motor vehicle charges. In addition, I agree to waive any double jeopardy claim as to any remanded disorderly persons offenses and / or motor vehicle violations.

| DATE | DEFENDANT |
|---|---|
| 10/30/09 | CYNTHIA U NDUKWE   C. Ndukwe |
| DATE | ATTORNEY |
| 10/30/09 | WILLIAM JOHNSON |

Sep 21, 2009 2:53:34 PM   jusaf6                                (Revised 1/2003)

**EXHIBIT A**

# PRETRIAL INTERVENTION

## SPECIAL CONDITIONS OF PTI SUPERVISION

| FIRST NAME: | MIDDLE NAME: | LAST NAME: |
|---|---|---|
| Cynthia | | Ndukwe |

| PROMIS NUMBER(S) | CAPS ID NUMBER |
|---|---|
| 09005072 | |

| COMMUNITY SERVICE: | DRIVERS LICENSE SUSPENSION: | LICENSE NUMBER: | LENGTH OF SUSPENSION: |
|---|---|---|---|
| ☒ YES  ☐ NO  HOURS: 50 | ☐ YES  ☒ NO | | 12 MONTHS |

| RESTITUTION IN THE AMOUNT OF: | PAYABLE TO: | PAYABLE THROUGH: |
|---|---|---|
| $ To be determined | Chikodiri Ndukwe | ☒ PROBATION  ☐ DIRECT PAY |

☐ DRUG / ALCOHOL TESTING AND / OR COUNSELING AS DIRECTED:

☐ MEDICAL / PSYCHOLOGICAL TESTS / EVALUATIONS AND / OR COUNSELING AS DIRECTED:

☒ ENROLLMENT FEE (VCCB) N.J.S.A. 2C:43-3.1(2)(d) $ 50.00
☐ Drug Enforcement Demand Reduction Penalty N.J.S.A. 2C:35-15a $
☐ Drug Abuse Education (DAEF) Fund N.J.S.A. 2C:43-3.5 $ 50.00
☐ FORENSIC LAB FEE N.J.S.A. 2C:35-20A $
☒ Safe Neighborhoods Assessment N.J.S.A. 2C:43-3.2a(2) $ 75.00
☐ Forfeit Weapons:

**ADDITIONAL CONDITIONS OR COMMENTS:**

1. Defendant shall pay restitution to the victim for any costs incurred as a result of the identity theft.
2. Seek/maintain employment.
3. Take steps to legalize immigration status.

My financial obligations imposed by the Court total $ 125.00

☐ I agree to pay $        today.
☒ I agree to make payments at the rate of $        per month
☐ I agree to pay the total amount forthwith.

I have received a copy of the Special conditions of PTI Supervision which have been read and explained to me. I may request a copy of the official Court Order from my Probation Officer. I understand the conditions of PTI Supervision and that they apply to me and I further understand that failure to comply on my part constitutes a violation of PTI Supervision and may cause my termination from the Program and prosecution of the charges against me.

I understand that if the offenses for which I am being enrolled into PTI were committed on or after March 1995, I will be charged a fee each time I make a payment through Probation.

- No fee on payments of $3.00 or less
- $1.00 fee on payments of $3.01 to $9.99
- $2.00 fee on payments of $10.00 or more

You must report to _____ on _____ at _____
You must comply with all standard and special conditions of Supervision imposed by the Court.

10/30/09
DATE

Cynthia Ndukwe
DEFENDANT

_____
DATE

_____
PROBATION OFFICER